# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 50303 | **DATE** | 11/13/2003 |
| **CASE TITLE** | Lukwinski vs. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐     Filed motion of [ use listing in "Motion" box above.]

(2) ☐     Brief in support of motion due _____.

(3) ☐     Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐     Ruling/Hearing on _____ set for _____ at _____.

(5) ☐     Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐     Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐     Trial[set for/re-set for] on _____ at _____.

(8) ☐     [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐     This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
       ☐ FRCP4(m)    ☐ General Rule 21    ☐ FRCP41(a)(1)    ☐ FRCP41(a)(2).

(10) ■     [Other docket entry]     For the reasons stated on the attached Memorandum Opinion and Order, Plaintiff's Motion for Summary Judgment is granted. The case is remanded for determination of whether Plaintiff satisfies Listings 1.12, 1.13 and/or 1.03. It is further ordered that Defendant's Motion for Summary Judgment is denied.

(11) ■     [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | 1 — number of notices |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | NOV 13 2003 — date docketed |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | 11/13/2003 — date mailed notice |
| | Copy to judge/magistrate judge. | |
| sp | courtroom deputy's initials | sp — mailing deputy initials |

U.S. DISTRICT COURT CLERK

03 NOV 13 PM 3: 43

Date/time received in central Clerk's Office

Document Number
24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| JOHN S. LUKWINSKI, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 02 C 50303 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

John S. Lukwinski ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on April 7, 2003. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I. BACKGROUND

Plaintiff filed for DIB on February 4, 2000, alleging disability on October 17, 1995. (Tr. 116). Plaintiff's application for benefits was denied on March 27, 2000. (Tr. 81). On May 30, 2000, Plaintiff filed a request for reconsideration. (Tr. 85). Plaintiff's request for reconsideration was denied on September 6, 2000. (Tr. 88). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on November 6, 2000. (Tr. 91). Plaintiff appeared, with counsel, before an ALJ on August 8, 2001. (Tr. 110). In a decision dated August 31, 2001, the ALJ

1

found that Plaintiff was not entitled to DIB. (Tr. 25). On October 31, 2001, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 11). On May 31, 2002, the Appeals Council denied Plaintiff's request for review. (Tr. 8).

## II.    FACTS

Plaintiff was born on January 9, 1950 and was fifty-one years at the time of his August 8, 2001 hearing. (Tr. 110). According to his own testimony, Plaintiff graduated from high school but did not complete any schooling or vocational training after high school. (Tr. 34). At the time of the hearing, Plaintiff was married and living with his wife and fifteen year old stepdaughter. (Tr. 33). Plaintiff suffers from pain in his right elbow associated with a prior elbow fracture and severe osteoarthritis of his knees. (Tr. 17). It is for these reasons that Plaintiff claims to be disabled.

From 1970 to 1995, Plaintiff testified that he worked as a truck driver. (Tr. 53). However, besides driving the truck, Plaintiff was required to load and unload the truck. (Tr. 35). Although the exact date and specifics are unknown to this court, Plaintiff was involved in an accident sometime in October 1995 that caused him injury to his right elbow. (Tr. 35). After the accident, Plaintiff had surgery on his right tricep and parts of his right arm. (Tr. 39). Plaintiff had two subsequent surgeries on his right arm in March 1996 and June 1996. (Id.). Instrumentation placed in Plaintiff's arm during one or all of these surgeries is now fractured and causes him discomfort. However, Plaintiff testified that his doctors told him that unless the metal starts to cut into his muscle or tissue there is no need to repair the fractured instrumentation because the humerus has healed in such a way that correction is futile. (Tr. 40). Additionally, Plaintiff stated that he had been sedated by anesthesia during all four surgeries and during the last two Plaintiff experienced complications with his blood pressure and arteries, possibly associated with Plaintiff's smoking habit. (Id.).

2

As a result of his accident, Plaintiff testified that he cannot return to work as a truck driver because he can no longer use his right arm to get into and out of the truck and his inability to use his right arm to load or unload the truck. (*Id.*). Further, Plaintiff testified that, as a result of his injury, he cannot use his right arm and/or hand to pick up a phone, use food utensils, shave, or use a camera. (Tr. 53).

After his last surgery in 1996, Plaintiff returned to work for his employer. (Tr. 45). However, because Plaintiff was in constant pain, Plaintiff needed to take pain medications such as Vicodin. (*Id.*). Plaintiff's employer did not think having Plaintiff drive while taking Vicodin was appropriate and placed Plaintiff on sedentary work doing such things as placing address labels on envelopes. (Tr. 35).

In 1999, Plaintiff worked for a telecommunications company doing phone solicitation from his home. (Tr. 132). Plaintiff worked for only three months. (*Id.*). Plaintiff generally worked from 8:00 a.m to 4:00 p.m or 5:00 p.m. Additionally, if needed, Plaintiff was able to work on the weekends. (Tr. 38). Plaintiff testified that he was terminated from this job around the time Plaintiff received his Workmens' Compensation settlement. (Tr. 36). Plaintiff stated the telecommunications company did not give him a reason for his termination; but rather, merely told Plaintiff his "services were no longer needed." (*Id.*). Plaintiff testified that he could have probably continued performing his job at the telecommunications company if not for his termination. (Tr. 37). Even more surprising, Plaintiff testified when asked that, at the time of his hearing before the ALJ, he could return to the telecommunications company and perform his sedentary work for eight hours a day and five days a week. (*Id.*). However, Plaintiff did testify that while he was working for the telecommunications company, he only worked twenty to twenty five hours a week and missed the

3

remaining twenty to fifteen hours for "various reasons." (Tr. 39).

In 1996, Plaintiff began to experience mild or early degenerative joint disease. (Tr. 46). In 1997, Plaintiff testified that his knees began to "extremely" bother him. (*Id*.). However, Plaintiff did not have surgery until 1999. Instead, Plaintiff testified he attempted various types of arthritic treatments and anti-inflammatory medications. (*Id*.). In 1996, prior to his surgery, Plaintiff testified he could have probably walked a "block or so" and sit for an hour or two. (Tr. 47). However, in 1999, just prior to his knee surgery, Plaintiff testified that he could walk "15, 20 feet." (Tr. 59). As of the hearing, Plaintiff stated that his knees were feeling good and that he could probably walk half to three quarters of a block without having to take rest. However, Plaintiff also stated that he has a stress fracture or crack in his right kneecap that will eventually need replacement. (Tr. 42).

In terms of Plaintiff's day-to-day activities, Plaintiff indicated that he normally gets out of bed around 4:35 a.m. (Tr. 49). He usually lets the dog out and has coffee with his wife before she goes to work. (*Id*.). Next, Plaintiff usually tends to household chores and waters the grass or the flowers. (*Id*.). Plaintiff testified that he does the cooking and some vacuuming and dusting. (*Id*). Additionally, Plaintiff stated he is able to place the laundry in the washing machine and start it up and then take the wet clothes from the washing machine and place them in the dryer. (*Id*.). Plaintiff is able to mow his lawn using his left arm but is unable to shovel snow. (Tr. 51).

Vocational expert, Frank Mendrich, appeared before the ALJ during Plaintiff's August 2001 hearing. (Tr. 68). Mr. Mendrich testified that Plaintiff's prior work as a truck driver would be classified as semi-skilled work with variations between heavy and medium exterior required. (*Id*.). Plaintiff's job labeling, Mr. Mendrich stated, would be deemed unskilled sedentary work and Plaintiff's telecommunications job would also be deemed unskilled sedentary work. (Tr. 69). With

4

that in mind, the ALJ asked Mr. Mendrich whether an individual who is 51 years old and has the work experience and education of Plaintiff and has the following limitations: "could sit for six hours; stand and walk for six hours; lift and carry frequently up to 10 lbs., occasionally up to 20 lbs.; could only occasionally crawl, climb, crouch, kneel or balance" could perform work as a telemarketer. (*Id.*). In response, Mr. Mendrich stated that such an individual could perform the telemarketing work but would not be able to drive a delivery truck. (*Id.*). Additionally, Mr. Mendrich stated that such an individual could perform inspection jobs at the light level (approximately 4,000 in the six-county Chicago metropolitan area), guard duty with no weapon (approximately 8,000 in the six-county Chicago metropolitan area), and work as a cashier (approximately 10,000 in the six-county Chicago metropolitan area).

When asked to assume the individual was limited to only being able to carry less than 10 lbs. with the dominant right upper extremity and can do no overhead reaching with that right upper extremity, Mr. Mendrich testified that work as a telemarketer would still be possible. (Tr. 70). Additionally, Mr. Mendrich stated, even with the additional limitations, the individual could still perform work as an inspector, guard, or cashier. (*Id.*). Finally, when asked to assume the individual could not stand or walk for more than two hours out of the day, Mr. Mendrich testified that the telemarketer job would still be available. (*Id.*). However, while jobs as an inspector, guard, and cashier would still be available, such availability would be lessened to only include work at the sedentary level.

## III.   MEDICAL HISTORY

Plaintiff saw Dr. Nicholas Kinnas, of Lutheran General Hospital, on October 17, 1995. Dr. Kinnas indicated that an examination of Plaintiff's right elbow revealed a severely comminuted

5

fracture involving the distal radius. (Tr. 179). Dr. Kinnas also noted that Plaintiff's elbow contained a vertical component extending to the articular surface and multiple fracture fragments, the largest involving the lateral and medial epicondyle. (*Id.*). Ultimately, Dr. Kinnas concluded that Plaintiff's elbow contained a severely comminuted fracture involving the distal radius extending to and involving the articular surface with some displacement and insulation of fracture fragments. (*Id.*).

Also on October 17, 1995, Dr. Kinnas reported that an AP view of Plaintiff's shoulder revealed some sclerosis involving the lateral cortex of the humerus distal to the insertion of the rotator cuff tendon. (Tr. 181). Additionally, Dr. Kinnas indicated that there was a question of calcific density in the region adjacent to the surgical neck. (*Id.*).

Dr. Alexander Michael, also of Lutheran General Hospital, performed a spine single view of Plaintiff on October 18, 1995. Dr. Michael reported that Plaintiff's spinal alignment from C1 to C7 was normal. (Tr. 185). The C7-T1 junction was not well visualized. Dr. Michael also reported that while compression fractures of the vertebra bodies were excluded, the posterior elements of the lower three vertebra were not well visualized for good evaluation. (*Id.*).

On October 19, 1995, Dr. Eugene Borchart, of Lutheran General Hospital, performed an interval surgery on Plaintiff's right elbow. (Tr. 186). Dr. Borchart reported that Plaintiff's surgery required an internal metallic fixation of an extensively comminuted fracture involving the distal shaft and condylar portion of the humerus with interarticular extension. (*Id.*). Dr. Borchart accomplished this produce by placing two relatively long compression plates, one extending posteriorly and the other medially, along the comminuted distal humeral fracture. Dr. Borchart indicated a relatively normal alignment with varying degrees of separation at the fracture was noted. (*Id.*).

Dr. Jeffery Visotsky, of Lutheran General Hospital, saw Plaintiff on October 22, 1995. Dr.

Visotsky indicated that the positioning of Plaintiff's patella was somewhat superior in location. (Tr. 188). Additionally, Dr. Visotsky reported that osteophytes were noted about the tibiofemoral joint and ardminent effusion was noted. (*Id.*). Ultimately, Dr. Visotsky reported that Plaintiff's findings suggest the possibility of superior dislocation of the patella, and clinical correlation was advised. (*Id.*). On October 29, 1995, Dr. Visotsky performed a right tricep repair, an open reduction and internal fixation of intercondylar supracondylar fracture, a right olecranon osteotomy, and a right ulnar nerve transposition on Plaintiff. (Tr. 190). In order to accomplish these procedures, Dr. Visotsky reported that a longitudinal incision was made over Plaintiff's distal ulnar mid forearm to the mid humeral area. (*Id.*). Plaintiff's ulnar nerve was then decompressed and transferred. (*Id.*) An olecranon osteotomy was performed and elevated. (*Id.*). A portion of Plaintiff's tricep was seen torn and subsequently repaired using #2 and #1 sutures. Multiple interfragmentary screws were placed and pins were used to hold and capture the majority of Plaintiff's numerous fracture fragments. (*Id.*).

Dr. Visotsky saw Plaintiff again on October 31, 1995. (Tr. 196). Dr. Visotsk indicated that Plaintiff's incision line was dry and clean and that Plaintiff was fit for a Bledsoe brace.[1] (*Id.*). Plaintiff saw Dr. Visotsky again on November 21, 1995. (Tr. 197). Dr. Visotsky reported that Plaintiff was making good progress and that he was attending therapy to regain full range of motion in his elbow. (*Id.*). As of November 21, 1995, Dr. Visotsky indicated that Plaintiff "is disabled from his previous occupation as a truck driver and his time should be devoted solely to the structured therapy program. He may be able to return to work in a limited duty capacity in one month." (*Id.*).

---

[1] Named after Bledsoe Brace Systems Medical Technology Inc., not for the quarterback of the New England Patriots.

The next report from Dr. Visotsky is dated December 5, 1995. (Tr. 176). On that date, Dr. Visotsky reported that an examination of Plaintiff indicated marked swelling of the right elbow with intact skin. (*Id.*). X-rays also indicated a comminuted bicondylar fracture of the right distal humerus. (*Id.*). According to Dr. Visotsky's report, Plaintiff initially had some numbness of his entire hand after the October 19, 1995 procedure. (*Id.*).

On January 16, 1996, Plaintiff was experiencing increasing pain in his right elbow. (Tr. 198). Allegedly, a therapist "bent his arm over a chair or table [and] he felt a pop." (*Id.*). As a result of this, Dr. Visotsky reported that Plaintiff experienced increased pain and swelling in his right elbow. X-rays revealed a fracture of Plaintiff's internal hardware at a proximal fracture site. As of January 16, 1996, Dr. Visotksy ceased all physical therapy and fit Plaintiff with an "orthosis." (*Id.*). Plaintiff saw Dr. Visotsky a few days later on February 9, 1996. Although Dr. Visotsky reported Plaintiff still experienced pain in his right elbow, the report also indicated that Plaintiff's swelling "markedly diminished." (*Id.*).

On March 1, 1996, Plaintiff saw Dr. David J. Raab regarding pain in his knee. Dr. Raab performed a physical exam of Plaintiff's knee which revealed medial joint line tenderness with positive McMurray's localized medially. (Tr. 199). Dr. Raab reported that he believed Plaintiff was suffering from early degenerative arthritis medial compartment and a medial meniscal tear. Dr. Raab injected Plaintiff's knee with 1 cc of Triamcinolone and Lidocaine and suggested that an arthroscopy may be necessary for Plaintiff's knee in the future. (*Id.*).

Plaintiff returned to see Dr. Visotsky on March 8, 1996. (Tr. 201). Dr. Visotsky reported that Plaintiff showed no evidence of healing and had "gross motion" at the fracture site. (*Id.*). Dr. Visotsky suggested an open reduction internal fixation and removal of hardware along with fixation

with a modified cloverleaf plate. (*Id.*). Dr. Visotsky reported that the risks and complications were discussed with Plaintiff as was the necessity for Plaintiff to quit smoking in order for healing to properly occur. (*Id.*). Plaintiff appears to have had the procedure on April 4, 1996. (Tr. 284).

Plaintiff continued to see Dr. Visotksy after the procedure, and although Dr. Visotsky filed some reports, not until May 3, 1996 was anything of substance discussed. On May 3, 1996, Dr. Visotksy reported that Plaintiff was doing "really good." (Tr. 203). Dr. Visotsky indicated that new bone formations were seen and the new hardware was intact and not loose. (*Id.*). Dr. Visotsky reiterated as much on May 17, 1996. (Tr. 204). However, things took a turn for the worse on June 14, 1996.

Plaintiff experienced increased pain and swelling in early June. On June 14, 1996, Dr. Visotsky reported that Plaintiff broke the hardware again and had a fracture in the large plate and the lateral recomp plate. (Tr. 205). Dr. Visotksy reported that he placed Plaintiff in a cast, continued electrical stimulation, and reenforced the importance of Plaintiff discontinuing smoking. (*Id.*). In fact, Dr. Visotsky made a point to spend much of his report on the issue of Plaintiff's continued smoking and how smoking is a definite intervening factor that has a negative affect on the fracture healing properly (a some what self-serving excuse it seems to the court)(*Id.*).

Plaintiff saw Dr. Visotsky about a month later on July 5, 1996. (Tr. 206). Dr. Visotsky indicated that Plaintiff had less edema and was continuing to use a cast immobilizer. Further, Dr. Visotsky reported that there was indication of a union in the distal segments. (*Id.*). If Plaintiff's treatment failed at this point, Dr. Visotsky reported that Plaintiff may require an Ilizarov external fixation of his fracture. (*Id.*). On September 9, 1996, Dr. Visotksy reported that Plaintiff was making good improvement and was allowed to return to work in a "modified duty capacity,

sedentary work." (Tr. 209). Plaintiff continued to improve and experience less pain until March 1997.

On March 21, 1997, Plaintiff saw Dr. Visotsky regarding pain not in his elbow. First, Plaintiff complained of increasingly lower back pain that was becoming symptomatic. (Tr. 216). Additionally, Plaintiff complained of pain radiating along the anterolateral aspect of his leg to his knee. (*Id.*). Dr. Visotsky recommended a continued work up of Plaintiff's lumbar region for right sided herniated disk and on Plaintiff's knees. (*Id.*). Dr. Visotsky also indicated that Plaintiff still only had limited motion in his elbow. (*Id.*).

Plaintiff had a complete work up of his knees done on April 11, 1997. (Tr. 219). Plaintiff's range of motion in his knees on April 11, 1997 was from 0 to 120 degrees. Dr. Raab reported that Plaintiff did have patellofemoral crepitus as well as marked medial tibial femoral crepitus and pain localized along the medial joint line bilaterally. (*Id.*). Plaintiff was also positive McMurrays bilaterally. (*Id.*). Dr. Raab indicated that while arthroscopy may give Plaintiff some relief, the long term effects of knee arthroscopy may be marginal. (*Id.*).

Plaintiff continued to see Dr. Visotsky for his elbow and Dr. Raab for his knees. Dr. Visotsky's reports continued to indicate that Plaintiff was healing nicely (although Plaintiff continued to have no motion at the fracture site in his arm) and that he was experiencing less pain in his elbow and limited motion at the fracture site. (Tr. 224). However, Plaintiff continued to have pain in his knees. On June 27, 1997, Dr. Raab reported that Plaintiff was having quite a significant amount of bilateral leg pain and his range of motion decreased by ten degrees from his April 11, 1997 examination. (*Id.*). Dr. Raab also indicated that Plaintiff had medial joint line tenderness with medial tibial femoral crepitus. (*Id.*).

10

Plaintiff's range of motion in his knees returned to 120 degrees on November 21, 1997. (Tr. 228). However, Plaintiff continued to complain of bilateral knee pain equally in both knees. Dr. Raab also reported that Plaintiff had a trace effusion at most with no lateral joint line tenderness but Plaintiff did have marked medial joint line tenderness with medial tibial femoral crepitus. (*Id.*). Dr. Raab commenced the first of three injections of Synvisc. (*Id.*).

On February 13, 1998, Dr. Visotsky indicated, that in his opinion, Plaintiff could return to driving a car. (Tr. 233). However, Dr. Visotsky indicated that Plaintiff should be limited to driving to local areas. (*Id.*). On March 13, 1998, Dr. Visotsky lifted the local areas driving restriction and reported that Plaintiff could return to driving an automatic for unlimited distances. (Tr. 234).

A Back to Work Program Functional Capacity Evaluation Summary was filled out by Anne Schilling (an Evaluator), Laurie Kovacs (Lower Extremity Neuromuscular Evaluator), and James Blaz (Supervisor of the Back to Work Program) of Centegra Health System. (Tr. 349). In terms of Plaintiff's symptomatic response to the functional capacity evaluation, the summary indicated Plaintiff demonstrated difficulty with any extended standing, walking, squat lifts, and stair climbing due to right lower extremity symptoms. (*Id.*). Additionally, Plaintiff's decreased strength of the right upper extremity limited activity requiring overhead lifts, weight box carries, and any upper extremity pushing/pulling. (*Id.*). In terms of pain, the summary indicated Plaintiff was placed in the high pain profile. (*Id.*). Ultimately, the three evaluators opined that Plaintiff could tolerate a full return to work as a truck driver. (*Id.*). While Plaintiff would not be able to handle the climbing into/out of the truck cab or trailer with greater then occasional frequency, the summary indicated that Plaintiff could handle the actual driving of the truck. (*Id.*).

Plaintiff continued to see to Dr. Raab and Dr. Vistosky for his knee and elbow aliments.

11

Both Drs. indicated that Plaintiff was improving in mobility and in lessening pain. However, Plaintiff's knees again took a turn for the worse in October 1998. On October 30, 1998, Dr. Raab reported that Plaintiff has "reached the point where he is significantly debilitated by both knees." (Tr. 241). In fact, Dr. Raab indicated that Plaintiff's daily activities, as well as his quality of life, had been affected by his knees. (*Id.*). Physical therapy, anti-inflammatory medications and multiple cortisone injections failed and on October 30, 1998, Dr. Raab indicated Plaintiff was looking for surgical intervention. (*Id.*). An X-ray of Plaintiff's knees revealed that the right knee was bone on bone in the medial compartment with evidence of pseudo gout in the lateral compartment as well. (*Id.*). Also on October 30, 1998, Dr. Visotsky saw Plaintiff. (Tr. 242). Dr. Visotsky reported that he and Plaintiff reviewed the functional capacity evaluation. Dr. Visotsky indicated that he believed Plaintiff could return to work within the limits indicated on the evaluation as well as continuing a conservative treatment program. (*Id.*).

From October 1998 to November 1999, Plaintiff's elbow continued to improve; however, Plaintiff's knees worsened. On November 26, 1999, Dr. Raab reported that he aspirated about 40 cc of gelatinous fluid from the Baker's cyst on the left. (Tr. 246). Additionally, Dr. Raab indicated that in Plaintiff's present state on November 26, 1999, Plaintiff would not improve and there was little reason to delay surgery. (*Id.*). Plaintiff underwent a bilateral total knee arthroplasty a few days later.

Things seemed bright for Plaintiff after the surgery. On December 17, 1999, Dr. Raab reported that Plaintiff "is 3 weeks status post bilateral total knee arthroplasty. He is doing outstanding. He states his pain is already dramatically improved. He feels like a new man." (Tr. 249). Dr. Raab's assessment continued into January where Dr. Raab commented that six weeks post

12

bilateral total knee arthroplasty, Plaintiff "is really doing outstanding." (Tr. 251).

On March 13, 2000, Dr. Charles Kenney performed a physical residual functional capacity assessment of Plaintiff based on Plaintiff's medical records. (Tr. 398). Dr. Kenney opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently. (Tr. 399). Dr. Kenney also indicated that he believed Plaintiff could stand and/or walk for about six hours in an eight hour day and push and/or pull an unlimited amount of weight. (*Id.*). In terms of postural limitations, Dr. Kenney indicated that Plaintiff could stoop frequently, climb, balance, kneel, crouch and crawl occasionally. (Tr. 400). Ultimately, Dr. Kenney reported that Plaintiff did not have any current complications from his arm fracture and his current complications regarding his knees should have been resolved by November 2000. (Tr. 405).

Plaintiff saw Dr. Raab again on October 13, 2000. (Tr. 407). Dr. Raab reported that Plaintiff was doing "extremely well." X-rays of Plaintiff's knees also indicated favorable recovery for Plaintiff. (*Id.*). Plaintiff was able to perform straight leg raises and maintain a straight leg raise for an unknown period of time. (*Id.*).

On December 10, 2001, Dr. Raab wrote Robert Newman of the Law Offices of Garofalo, Schreiber, and Hart. (Tr. 618). Dr. Raab wrote that Plaintiff has "significant limitations on his ability to work." (*Id.*). Such limitations, according to Dr. Raab, would include no climbing, crawling or kneeling and a restricted standing of less then six hours per day. (*Id.*). Dr. Raab also indicated that he believed a "permanent restriction, primarily in a sedentary position, would be ideal. He may be somewhere in between light work capacity and a sedentary work capacity." (*Id.*).

IV.     **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the

13

proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision rests with the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. §405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 998 F.2d 473, 487 (7th Cir. 1993). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater

14

freedom to review the ALJ's decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

## V.   **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[2] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that

---

[2]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[3] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467, 470-71 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional

---

[3]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.  ANALYSIS

The court will proceed through the five step analysis in order.

A.  Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis, apparently the ALJ found that Plaintiff may not have engaged in any substantial gainful activity at any time relevant to his decision issued on August 31, 2001. (Tr. 18). Specifically, the ALJ stated that "[b]ased on posted earnings from Smart Telecommunications, Inc., that job constituted substantial gainful activity. However, even assuming that it was not substantial gainful activity, there exists a valid basis for denying the [Plaintiff's] application ... ." (*Id.*).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000). For the reasons stated below, the Smart Telecommunications job was not substantial gainful employment.[4]

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the

---

[4] It appears the ALJ mistakenly included Plaintiff's workers compensation monthly pay with Plaintiff's monthly pay from Smart Telecommunications. According to the records before this court, Plaintiff earned $4765.50 in 1999, the year he worked for Smart Telecommunications. This amount breaks down to approximately $397 a month which is below the $500 a month required for substantial gainful activity during January 1990 thru June 1999 and below the $700 a month required for substantial gainful activity from July 1999 thru December 2000. *See* 20 CFR § 404.1574 (b)(ii)(B). Because the $397 is below either amount, this court assumes the ALJ included Plaintiff's temporary total disability payments to reach an amount that would justify stating "the job constituted substantial gainful activity." However, 20 CFR 404.1574(a)(2) states that "we do not consider any income that is not directly related to your productivity." *Id.*

Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found the Plaintiff's "condition produces limitations, which meet this definition of 'severe.'" (Tr. 18).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.    Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 18).

The ALJ found:

> The third step of the sequential evaluation requires determining whether the [Plaintiff's] condition meets the requirements or equals the level of severity contemplated for any impairment listed in Appendix 1 to Subpart P, Regulations No. 4. In this case, the [Plaintiff's] condition does not satisfy that standard.

(Tr. 18). The outcome at Step Three is not that obvious. As such, this court believes the severity of Plaintiff's impairments related to his knees and right arm deserves more than a mere conclusory sentence, especially because, when fully evaluated, the Plaintiff's impairments may meet or medically equal in severity the criteria listed in Appendix 1. Even more problematic is that the ALJ failed to discuss, or even cite, Listing 1.12, Listing 1.13 or Listing 1.03. Depending on the circuit, this omission alone would dictate remand. *Compare Burnett v. Commissioner*, 220 F.3d 112, 119-20

19

(3d Cir. 2000)(remanding where the ALJ "'merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairments,' without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning.")(*citing Clifton v. Chater*, 79 F.3d 1007, 1009)(10th Cir. 1996)), *with Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999)(holding that the conclusory form of the ALJ's decision alone does not justify remand). However, the Seventh Circuit has not directly ruled whether failing to discuss or even cite a Listing at step three justifies remand. *See Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)(stating the Seventh Circuit need not address the tension between the circuits as to whether a conclusory statement at Step Three is fatal because the ALJ's decision could not stand even if she cited the correct rule). This court is hard pressed to proceed without a complete analysis at Step Three.

In order to properly determine that Plaintiff does not satisfy the requirements of Listing 1.12 or Listing 1.13, neither of which the ALJ mentioned, the ALJ must proceed through the listings. Section 1.12 provides:

> *Fracture of an upper extremity* with non-union of a fracture of the shaft of the humerus, radius, or ulna under continuing surgical management directed toward restoration of functional use of the extremity and such function was not restored or expected to be restored within 12 months after onset.

Section 1.13 provides:

> *Soft tissue injuries of an upper or lower extremity* requiring a series of staged surgical procedures within 12 months after onset for salvage and/or restoration of major fuction of the extremity, and such major function was not restored or expected to be restored within 12 months after onset.

The above sections obviously deal with Plaintiff's right arm. Although many of Plaintiff's

20

medical records indicate that Plaintiff's right elbow was healing, Dr. Visotsky, during a deposition on March 21, 2000, indicated that he was still treating Plaintiff because Plaintiff had "[l]imited motion, restrictions, pain, and the obvious nonunion of his fracture." (Tr. 550). Plaintiff's first surgery, on October 19, 1995, resulted in broken internal hardware which resulted in a second surgery on March 1, 1996. Plaintiff had to endure a third surgery which consisted of an open reduction and internal fixation on June 19, 1996. Now, some three and half years later Dr. Visotsky testified that he is still treating Plaintiff due to, among other things, the nonunion of Plaintiff's fracture. This time period is well beyond the twelve month requirement found in Listing 1.12 and/or Listing 1.13. This needed to be discussed by the ALJ.

Additionally, Section 1.03 *Arthritis of a major weight-bearing joint*, not addressed by the ALJ, provides:

> With history of persistent joint pain and stiffness with signs of marked limitation of motion or abnormal motion of the affected joint on current physical examinations. With:
>
> A. Gross anatomical deformity of hip or knee (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) supported by X-ray evidence of either significant joint space narrowing or significant bony destruction and markedly limiting ability to walk and stand; or
>
> B. Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint and return to full weight-bearing status did not occur, or is not expected to occur, within 12 months of onset.

The record before this court is full of reports from Dr. Raab describing Plaintiff's knee problems. From his first report, Dr. Raab indicated that Plaintiff was suffering from degenerative arthritis of the medial compartment and a medial meniscal tear. (Tr. 199). Additionally, Plaintiff

had patellofemoral crepitus and a marked medial tibial femoral crepitus with pain localized along his medial joint line bilaterally. (Tr. 219). X-rays revealed that Plaintiff's knees were "bone on bone in the medial compartment" with evidence of psuedo gout in the lateral compartment. (Tr. 241). At one point, Dr. Raab even reported that Plaintiff's knees had "reached the point where [Plaintiff] is significantly debilitated by both knees." (*Id.*). While it appears that Plaintiff's knees substantially improved after his November 1999 surgery, Dr. Raab's December 31, 2001 letter to Robert Newman indicated that Plaintiff cannot climb, crawl or kneel. (Tr. 618).

Even if Plaintiff may not satisfy Listing 1.12 or 1.03 individually, Plaintiff may nonetheless be disabled when his ailments are taken in combination. Additionally, the ALJ did not discuss Plaintiff's obesity which would appear to have an affect on his knees. Section 1.00(F) provides:

> *Effects of Obesity.* Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

According to the record before this court, Plaintiff weighs over three hundred pounds. Plaintiff's weight, when combined with his knee problems, may rise to a level of disability under the listings. However, without an analysis from the ALJ, this court cannot determine even if the ALJ looked at Plaintiff's right arm, knees, and weight in combination when addressing Step Three.

Principles of administrative law require the ALJ to rationally articulate the grounds for her

22

decisions thereby building "an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This then allows the court to confine review to the reasons supplied by the ALJ. *See Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). This has not been done and this court cannot proceed.

This court acknowledges that Plaintiff himself (and his doctors) has stated, during his hearing before the ALJ, that he was able to perform his telecommunications job. While such a statement and evidence from Plaintiff's doctors would carry weight at Steps Four and Five of the process, at Step Three, where the process currently rests, such a statement is of little value. At Step Three, the ALJ is required to determine whether Plaintiff meets or is medically equivalent to one of the listings. Whether Plaintiff can perform a telecommunications job is irrelevant. What is relevant is whether, under the listings, Plaintiff is disabled based on his impairments.

Before the ALJ can proceed onto Step Four and Five of the disability determination, the ALJ must at the very least discuss Listings 1.12, 1.13, and 1.03 and Plaintiff's obesity, since they apply to Plaintiff's history of arm, knees, and weight ailments. This court is not suggesting that once evaluated the ALJ should determine that Plaintiff satisfies a combination of one or more the listings, but only that some elaboration is necessary. The ALJ should discuss the evidence at least to the extent to show this court the path used by the ALJ and the evidence accepted and the evidence rejected.

## VII.   CONCLUSION

For the above stated reasons, Plaintiff's Motion for Summary Judgment is granted. The case is remanded for determination of whether Plaintiff satisfies Listings 1.12, 1.13 and/or 1.03. It is

further ordered that Defendant's Motion for Summary Judgment is denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 11/13/03

24